**No. 24-2626**

# United States Court of Appeals
# for the Ninth Circuit

GOPHER MEDIA, LLC, et al.,

*Plaintiffs, Counter-Defendants, and Appellants*,

*v.*

ANDREW MELONE, et al.,

*Defendants, Counter-Claimants, and Appellees*,

On Appeal from the U.S. District Court
for the Southern District of California
No. 3:21-cv-01909-RBM (VET)
Judge Ruth Bermudez Montenegro

## APPELLANTS' OPENING BRIEF

**MUNCK WILSON MANDALA LLP**
ANTON "TONY" HANDAL
(SBN 113812)
thandal@munckwilson.com
MARINA BOGORAD (SBN 217524)
mbogorad@munckwilson.com
1925 Century Park East, St. 2300
Los Angeles, California 90067
(310) 855-3311
(972) 628-3616 fax

**MUNCK WILSON MANDALA LLP**
CHASE A. COBERN
(SBN 24101633)
ccobern@munckwilson.com
12770 Coit Road, St. 600
Dallas, Texas 75251
(972) 628-3600
(972) 628-3616 fax

*Counsel for Appellants*

July 1, 2024

# TABLE OF CONTENTS

JURISDICTIONAL STATEMENT ...........................................13

INTRODUCTION .....................................................14

STATEMENT OF THE ISSUES ...............................................15

STATEMENT OF THE CASE..................................................16

    A. Appellants' Speech and Petitioning Activities...............16

    B. Appellees' Retaliatory Counterclaims...........................19

    C. The District Court's Denial of Anti-SLAPP Protection..22

SUMMARY OF THE ARGUMENT.........................................24

STANDARD OF REVIEW ....................................................26

ARGUMENT...............................................................27

I. All Counterclaims Are Subject To Anti-SLAPP Review. .....28

II. All Counterclaims Arise From Protected Activity. ..............37

    A. All counterclaims rest on speech in a public forum. .......38

    B. The operative speech concerns public issues. ..............40

    C. The district court's reliance on motive was legal error...48

III. All Counterclaims Fail On The Merits. ..............................55

    A. The operative speech is protected opinion. ...................55

        1. The district court applied the wrong standard.........56

        2. The broad context negates factual implications.......59

        3. The specific context negates factual implications. ...67

        4. Any factual implications are not provably false........75

    B. The undated speech fails to identify Appellees. ............78

    C. There are no cognizable special damages for trade libel. 80

    D. There is no cognizable claim in equity under the UCL. ..83

CONCLUSION AND STATEMENT OF RELIEF SOUGHT......85

# TABLE OF AUTHORITIES

**Cases:**

*Abir Cohen Treyzon Salo, LLP v. Lahiji,*
   254 Cal.Rptr.3d 1 (Ct.App.2019) .........................................42

*Abraham v. Lancaster Cmty. Hosp.,*
   266 Cal.Rptr. 360 (Ct.App.1990) .......................................73

*Aristocrat Plastic Surgery P.C. v. Silva,*
   206 A.D.3d 26 (N.Y.App.Div.2022) .............................43, 66

*Baker v. Los Angeles Herald Exam'r,*
   721 P.2d 87 (Cal. 1986) ........................................ 59, 64, 66

*Baral v. Schnitt,*
   376 P.3d 604 (Cal. 2016) ...................................................36

*Barrett v. Rosenthal,*
   146 P.3d 510 (Cal. 2006) ...................................................40

*Beilenson v. Superior Court,*
   52 Cal.Rptr.2d 357 (Ct.App.1996).....................................68

*Bilinski v. Keith Haring Found., Inc.,*
   632 F. App'x 637 (2d Cir. 2015) ........................................83

*Blatt v. Pambakian,*
   2021 WL 4352329 (9th Cir. 2021) .....................................73

*Blatty v. N.Y. Times Co.,*
   728 P.2d 1177 (Cal. 1986) ...................................... 80, 81, 82

*Bonni v. St. Joseph Health Sys.,*
   491 P.3d 1058 (Cal. 2021).................... 27, 28, 40, 45, 46, 51

**Cases—continued:**

*Bose Corp. v. Consumers Union of U.S., Inc.*,
    466 U.S. 485 (1984)....................................................77, 78

*Bridges v. California*,
    314 U.S. 252 (1941) ..........................................................80

*Campanelli v. Regents of Univ. of Cal.*,
    51 Cal.Rptr.2d 891 (Ct.App.1996) ................................60, 75

*Chaker v. Mateo*,
    147 Cal.Rptr.3d 496 (Ct.App.2012)......42, 62, 63, 64, 78, 79

*City of Montebello v. Vasquez*,
    376 P.3d 624 (Cal. 2016) ..................................................28

*Clancy v. Vacationaire Ests., Inc.*,
    2019 WL 955113 (D. Minn. Feb. 27, 2019)........................74

*Clifford v. Trump*,
    818 F. App'x 746 (9th Cir. 2020) ......................................44

*ComputerXpress, Inc. v. Jackson*,
    113 Cal.Rptr.2d 625 (Ct.App.2001) .......................63, 64, 79

*Daw Indus., Inc. v. Hanger Orthopedic Grp., Inc.*,
    556 F. App'x 604 (9th Cir. 2014) ......................................84

*DC Comics v. Pac. Pictures Corp.*,
    706 F.3d 1009 (9th Cir. 2013) ...........................................14

*Demetriades v. Yelp, Inc.*,
    175 Cal.Rptr.3d 131 (Ct.App.2014)...................................42

**Cases—continued:**

*Doe v. Gangland Prods., Inc.*,
  730 F.3d 946 (9th Cir. 2013)...............................41, 51, 53, 55

*DuPont Merck Pharm. Co. v. Superior Ct.*,
  92 Cal.Rptr.2d 755 (Ct.App.2000) ......................... 44, 48, 51

*Duran v. City of Douglas*,
  904 F.2d 1372 (9th Cir. 1990)....................................79, 80

*Dworkin v. Hustler Mag. Inc.*,
  867 F.2d 1188 (9th Cir. 1989) ................................74, 75, 79

*Engineer.AI Corp. v. Kaufman*,
  2024 WL 242991 (9th Cir. 2024)......................................73

*Ferlauto v. Hamsher*,
  88 Cal.Rptr.2d 843 (Ct.App.1999) ....................................73

*FilmOn.com Inc. v. DoubleVerify Inc.*,
  439 P.3d 1156 (Cal. 2019)..................................................38

*Gardner v. Martino*,
  563 F.3d 981 (9th Cir. 2009) .....................56, 57, 58, 62, 63

*Gauna v. Frisella Nursery, Inc.*,
  2023 WL 2645604 (E.D. Mo. Mar. 27, 2023).....................75

*Geiser v. Kuhns*,
  515 P.3d 623 (Cal. 2022) .....................27, 48, 49, 53, 54, 55

*Gilbert v. Sykes*,
  53 Cal.Rptr.3d 752 (Ct.App.2007).....................................70

**Cases—continued:**

*Greater L.A. Agency on Deafness, Inc. v.*
*Cable News Network, Inc.*,
742 F.3d 414 (9th Cir. 2014) ...............................................28

*Greger v. Barnhart*,
464 F.3d 968 (9th Cir. 2006) .............................................86

*Gunn v. Drage*,
65 F.4th 1109 (9th Cir. 2023) .....................................27, 46

*Guzman v. Polaris Indus. Inc.*,
49 F.4th 1308 (9th Cir. 2022) ............................................85

*Haight Ashbury Free Clinics, Inc. v.*
*Happening House Ventures*,
110 Cal.Rptr.3d 129 (Ct.App.2010) ....................................52

*Hartford Cas. Ins. Co. v. Swift Distrib., Inc.*,
326 P.3d 253 (Cal. 2014) ............................................46, 81

*Herring Networks, Inc. v. Maddow*,
8 F.4th 1148 (9th Cir. 2021) ................. 28, 57, 58, 59, 61, 62
63, 69, 70, 71, 72, 77

*Honolulu Data Entry Project, Ltd. v. D. Bello Assocs.*,
721 F. App'x 658 (9th Cir. 2018) ........................................78

*Hosszu v. Barrett*,
716 F. App'x 622 (9th Cir. 2017) ........................................79

*Hustler Magazine, Inc. v. Falwell*,
485 U.S. 46 (1988) ......................................................66, 67

**Cases—continued:**

*J-M Mfg. Co. v. Phillips & Cohen LLP*,
    201 Cal.Rptr.3d 782 (Ct.App.2016) ..............................57, 58

*Jeppson v. Ley*,
    257 Cal.Rptr.3d 921 (Ct.App.2020) ............................54, 55

*Jones v. Thyssenkrupp Elevator Corp.*,
    2006 WL 680553 (N.D. Cal. Mar. 14, 2006) ............... 70, 71

*Kieu Hoang v. Phong Minh Tran*,
    274 Cal.Rptr.3d 567 (Ct.App.2021)..............................69, 70

*Knievel v. ESPN*,
    393 F.3d 1068 (9th Cir. 2005) .........................59, 61, 68, 69
                                                                                    70, 71, 72, 77

*Koch v. Goldway*,
    817 F.2d 507 (9th Cir. 1987) .............................................. 61

*Korea Supply Co. v. Lockheed Martin Corp.*,
    63 P.3d 937 (Cal. 2003) ...............................................85, 86

*Law Offices of David Freydin, P.C. v. Chamara*,
    24 F.4th 1122 (7th Cir. 2022)................................ 64, 66, 67

*Leidholdt v. L.F.P. Inc*,
    860 F.2d 890 (9th Cir. 1988) ............................................68

*Lieberman v. Fieger*,
    338 F.3d 1076 (9th Cir. 2003).....................................72, 73

*Mahanoy Area Sch. Dist. v. B.L. ex rel. Levy*,
    594 U.S. 180 (2021) ...........................................................79

**Cases—continued:**

*Makaeff v. Trump Univ., LLC,*
715 F.3d 254 (9th Cir. 2013) .................................. 18, 27, 43

*Marom v. Pierot,*
2020 WL 6572509 (S.D.N.Y. Aug. 30, 2020) ................... 75

*Metabolife Int'l, Inc. v. Wornick,*
264 F.3d 832 (9th Cir. 2001).................................. 29, 30, 31

*Mirza v. Amar,*
513 F.Supp.3d 292 (E.D.N.Y. 2021) ................................. 65

*Morrison v. Profanchik,*
578 S.W.3d 676 (Tex.App.2019) ................................. 43, 44

*Mr. Chow of N.Y. v. Ste. Jour Azur S.A.,*
759 F.2d 219 (2d Cir. 1985) .................................. 65, 66, 74

*Muddy Waters, LLC v. Superior Ct.,*
277 Cal.Rptr.3d 204 (Ct.App.2021)........................ 82, 83, 84

*Nelson v. Adams USA, Inc.,*
529 U.S. 460 (2000) .................................................. 32, 33

*Newport Harbor Ventures, LLC v.*
*Morris Cerullo World Evangelism,*
413 P.3d 650 (Cal. 2018)........................... 30, 32, 33, 35, 36

*Noyes v. Kelly Servs.,*
488 F.3d 1163 (9th Cir. 2007) ...................................... 36, 37

*Partington v. Bugliosi,*
56 F.3d 1147 (9th Cir. 1995) ............................................ 75

**Cases—continued:**

*Pasha v. Del Mar Coll. Dist.*,
  2008 WL 11393146 (S.D. Tex. Sept. 11, 2008) .................. 75

*Penrose Hill, Ltd. v. Mabray*,
  479 F.Supp.3d 840 (N.D. Cal. 2020) .................................. 65

*Phoenix Trading, Inc. v. Loops LLC*,
  732 F.3d 936 (9th Cir. 2013) .............................................. 61

*Polygram Records, Inc. v. Superior Court*,
  216 Cal.Rptr. 252 (Ct.App.1985) ...................................... 66

*Reed v. Gallagher*,
  204 Cal.Rptr.3d 178 (Ct.App.2016) ........................ 64, 65, 77

*RGC Gaslamp, LLC v. Ehmcke Sheet Metal Co.*,
  270 Cal.Rptr.3d 425 (Ct.App.2020) ............................ 52, 53

*Rosenaur v. Scherer*,
  105 Cal.Rptr.2d 674 (Ct.App.2001) ............................ 79, 80

*Sarver v. Chartier*,
  813 F.3d 891 (9th Cir. 2016) ........................... 29, 30, 31, 32
                                                           33, 41, 46, 47

*Sciore v. Phung*,
  2022 WL 950261 (D.N.J. Mar. 30, 2022) ......................... 65

*SDV/ACCI, Inc. v. AT & T Corp.*,
  522 F.3d 955 (9th Cir. 2008) ............................................. 82

*Sonner v. Premier Nutrition Corp.*,
  971 F.3d 834 (9th Cir. 2020) ............................................. 85

9

**Cases—continued:**

*Southern Pac. R. Co. v. U.S.*,
    200 U.S. 341 (1906)..............................................................86

*Steam Press Holdings v. Hawaii Teamsters,*
    *Allied Workers Union, Local 996*,
    302 F.3d 998 (9th Cir. 2002) ..................................67, 78, 79

*Summit Bank v. Rogers*,
    142 Cal.Rptr.3d 40 (Ct.App.2012).............. 41, 42, 43, 64, 65

*Themed Restaurants, Inc. v. Zagat Surv., LLC*,
    21 A.D.3d 826 (N.Y.App.Div.2005) ............................ 65, 66

*Thimes Sols., Inc. v. TP Link USA Corp.*,
    2024 WL 1328194 (9th Cir. Mar. 28, 2024)...........76, 83, 84

*Thimes Sols., Inc. v. TP-Link USA Corp.*,
    2022 WL 17818334 (C.D. Cal. Nov. 3, 2022)...............82, 83

*United States v. Sherburne*,
    249 F.3d 1121 (9th Cir. 2001) .............................................37

*Vargas v. JP Morgan Chase Bank, N.A.*,
    30 F.Supp.3d 945 (C.D. Cal. 2014).....................................85

*Wilbanks v. Wolk*,
    17 Cal.Rptr.3d 497 (Ct.App.2004)................................42, 43

*Wilson v. CNN, Inc.*,
    444 P.3d 706 (Cal. 2019) ........................... 14, 28, 38, 40, 50
                                           51, 52, 53, 55, 56

*Wong v. Jing*,
    117 Cal.Rptr.3d 747 (Ct.App.2010) ..............................42, 43

**Cases—continued:**

*Woodhill Ventures, LLC v. Yang,*
283 Cal.Rptr.3d 507 (Ct.App.2021)...............................54, 55

*Yang v. Tenet Healthcare Inc.*,
262 Cal.Rptr.3d 429 (Ct.App.2020) ............................ 41, 42

*ZL Techs., Inc. v. Gartner Grp., Inc*.,
433 F. App'x 547 (9th Cir. 2011) ..................................58, 77

**Statutes and Rules:**

28 U.S.C. §1291 ....................................................................... 14

28 U.S.C. §1331 ....................................................................... 14

28 U.S.C. §1367........................................................................ 14

Cal. Civ. Code §47 ................................................................. 73

Cal. Civ. Proc. Code

   §425.16 ................................15, 16, 27, 22, 23, 27, 28, 52, 53

   §425.16(e)................................. 23, 38, 39, 40, 41, 49, 52, 53

   §425.16(f) ...........................22, 29, 30, 31, 32, 33, 34, 35, 37

Fed. R. Civ. P. 12........................................ 20, 22, 32, 33, 57, 59

Fed. R. Civ. P. 15 .................................................................32, 33

Fed. R. Civ. P. 56 ..................................................................... 31

**Other Authorities:**

DAN B. DOBBS ET AL., THE LAW OF TORTS
§659 (2d Ed. 2011) ............................................................ 82

## Note

All internal alterations, quotation marks, footnotes, and citations herein are omitted, and all emphasis is added unless otherwise noted. All statutory references are to the California Code of Civil Procedure, unless otherwise indicated.

## JURISDICTIONAL STATEMENT

The district court exercised jurisdiction over Defendants, Counterclaimants, and Appellees Melone and AGFM Family Enterprises, LLC d/b/a American Pizza Manufacturing's ("APM") (collectively, "Appellees") counterclaims under 28 U.S.C §1367, as it had jurisdiction over Plaintiffs, Counter-Defendants, and Appellants Gopher Media LLC d/b/a Doctor Multimedia ("DMM") and Ajay Thakore's (collectively, "Appellants") original claims under 28 U.S.C. §§1331 and 1367. This Court has jurisdiction to review the district court's order denying Appellants' anti-SLAPP motion under 28 U.S.C. §1291. *See DC Comics v. Pac. Pictures Corp.*, 706 F.3d 1009, 1012-17 (9th Cir. 2013).

## INTRODUCTION

There is no dispute that all Appellees' counterclaims arise from pure speech in public forums: two Instagram posts and four Yelp restaurant reviews. There is also no dispute that this operative speech concerned the character, quality, and value of a business's products and services—recognized "issue[s] of public interest." Appellees themselves allege the speech generated enough public interest to "deprive [them] of a market." The district court nonetheless excluded the speech from anti-SLAPP protection merely because Appellees alleged it was "fake" and motivated by "personal revenge."

As construed by the California Supreme Court, "[t]his is not how the anti-SLAPP statute works." *Wilson v. CNN, Inc.*, 444 P.3d 706, 715 (Cal. 2019). Whether or not the operative speech was "illegitima[te]," "unlawful," or otherwise "based on a malicious motive" is entirely "*irrelevant*" to its statutory protection. *Id.* Otherwise, "allegation[s] of illicit motive w[ould] defeat any argument for anti-SLAPP protection." *Id.* at 714. The district court's reliance on the alleged illegitimacy and improper motive of the operative speech was thus reversible legal error.

14

Because Appellees' own pleadings concede that every counter-claim arises from protected activity, the counterclaims could not survive dismissal without a showing of probable success on the merits. Appellees did not make that showing. The First Amendment shields all the operative statements from Appellees' claims, and the district court never undertook the required contextual analysis to hold otherwise. To the extent this Court undertakes that analysis for the first time here, it should hold all operative statements nonactionable. Viewed in their proper contexts—heated and hyperbolic Instagram posts from an obviously exaggerated account, and subjective Yelp reviews of disgruntled customers' experiences—no reasonable reader would trust the operative statements as conveying objectively verifiable facts. The district court's denial of the anti-SLAPP motion should be reversed, and the counterclaims should be stricken.

## STATEMENT OF THE ISSUES

Whether the district court properly applied California's Anti-Strategic Lawsuit Against Public Participation (anti-SLAPP) statute, §425.16, when it declined to strike Appellees' counterclaims arising from alleged public statements made by Appellants.

## STATEMENT OF THE CASE

### A.  Appellants' Speech and Petitioning Activities

Ajay Thakore is the CEO and founder of Doctor Multimedia, a digital marketing company in La Jolla, California. 5-ER-767, ¶2. Mr. Thakore, an American citizen of Indian descent and resident of La Jolla, is a prominent social-media personality known for showcasing a luxurious lifestyle and engaging in provocative and sometimes controversial conduct. His associated Instagram handle, "acerogersceo," routinely publishes exaggerated, sarcastic, and whimsical content, including hyperbolic personifications of his three-legged dog, Aspen. *E.g.*, 6-ER-1258, ¶23 (Instagram post using hashtag "#richdog" and "#richdogonboard"); 4-ER-604 at 312:6-7 ("Aspen and I are getting some work done on our yacht."); 7-ER-1398 ("had to pull off his arm to survive" and "doesn't need any racist white people from La Jolla giving him a hard time").

In 2021, Mr. Thakore became embroiled in a heated controversy with a La Jolla restaurant called American Pizza Manufacturing, and its owner, Andrew Melone. 6-ER-1252, ¶3; 3-ER-238, ¶3. Mr. Thakore has testified under oath that on several occasions during the summer of 2021, APM representatives, including Mr.

16

Melone, denied him service and harassed him with various anti-Indian epithets. 7-ER-1547-48, ¶67 ("Paki"; "Sand Nigger"); 4-ER-593-96 at 94:1-110:13. Consistent with his larger-than-life persona, Mr. Thakore launched an aggressive but peaceful public boycott against APM's business practices. To that end, various messages criticizing the character of APM's business were displayed publicly outside APM's storefront, including on the exterior of luxury vehicles parked nearby, 6-ER-1256, ¶¶17-19 ("Take N Bake Pizza is Racist"; "Take N Bake Pizza Sucks"; "Only Losers Get Take n Bake Pizza"), and banners pulled by planes flying overhead. 6-ER-1257, ¶20 ("Just Say No to Take N Bake Pizza!").

Mr. Melone, for his part, sought to "deal with" Mr. Thakore's boycott "through community pressure" and attempts to "sway public opinion in [APM's] favor." 6-ER-1098-99 (Melone: "There is plenty we can do to combat this bad behavior. The court of public opinion is mighty and decisive."). One of Mr. Melone's associates personally confronted Mr. Thakore outside APM's storefront, removed messages displayed on his vehicle, and physically struck his dog. 7-ER-1548, ¶68; 6-ER-1258, ¶¶23-24; 6-ER-1098 (text message from Mr. Melone to associate describing "video of you

pealing his car" as "[h]ilarious"). Mr. Melone also "provide[d] comments" to local media outlets "so that more people knew about what was going on." 7-ER-1383; 7-ER-1386-95 (Appellees' expert report collecting "[s]ampling of stories"). In October 2021, for example, Mr. Melone told community newspaper the *La Jolla Light* that he was "feeling harassed by the presence of a car often parked outside [APM's] establishment bearing a disparaging message about its business model" as well as a "[a] plane … seen flying overhead pulling a banner." *[La Jolla pizza maker feels harassed by derogatory message on car parked in front of business](#)*, LA JOLLA LIGHT (Oct. 31, 2021) (last accessed June 29, 2024).[1] After naming both Mr. Thakore and DMM as potentially "responsible" for the alleged "harass[ment]," the article published Mr. Melone's assertions that the boycott "'started passively in the beginning' … with one person writing a series of disparaging things on social media about [APM] and Melone" that "[were]n't true about [their] business model," and that Mr. Melone had become "concerned for

---

[1] This Court recognizes in reviewing anti-SLAPP rulings that "[i]t is proper to take judicial notice of various publications introduced 'to indicate what was in the public realm at the time[.]'" *Makaeff v. Trump Univ., LLC*, 715 F.3d 254, 259 n.2 (9th Cir. 2013).

other businesses in the area that may be targeted." *Id.* Another article appearing the next day in *SanDiegoVille* published Mr. Melone's allegations that Mr. Thakore had committed "multiple instances of libel (against [his] business and [Mr. Melone] personally)" and had "a long history of poor/unchecked behavior." *San Diego Take-and-Bake Pizza Concept Allegedly Harassed By Land & Air*, SanDiegoVille (Nov. 1, 2021) (last accessed June 29, 2024). All told, according to an expert report attached to Appellees' pleading, Mr. Thakore's boycott "received widespread coverage" with "a total online news audience of 33,657,683." 7-ER-1374.

The controversy escalated in November 2021 when Mr. Thakore and DMM filed a federal lawsuit against APM and Mr. Melone. 8-ER-1633; 7-ER-1533. That lawsuit remains pending below, and alleges racial discrimination arising from APM and Mr. Melone's denials of service to Mr. Thakore, together with various infringements of Mr. Thakore's "First Amendment right to protest and boycott APM." 8-ER-1650-51, ¶95; 7-ER-1559, ¶127.

## B. Appellees' Retaliatory Counterclaims

APM and Mr. Melone filed counterclaims they described as a "response to the relentless and ongoing campaign of harassment

by [Mr. Thakore] and his company, [DMM]." 8-ER-1621, ¶1. The original counterclaims, as well as the first and second amended counterclaims, asserted trade libel claims and derivative UCL and declaratory relief claims. 8-ER-1628-31, ¶¶29-60; 7-ER-1528-32, ¶¶30-64; 7-ER-1513-16, ¶¶30-64. They identified a range of alleged false statements as "General Allegations," including "more than a hundred fake negative reviews," but only "[s]pecifi-cally" alleged the following conduct in support of the trade libel count: "falsely accus[ing] Counterclaimants of abusing animals, 'hating people of color,' using racist language, and accusing [Ap-pellants'] business of being unsanitary." 8-ER-1628, ¶30; 7-ER-1540, ¶31; 7-ER-1513, ¶31.

Appellants moved for judgment on the pleadings under Rule 12(c), which the district court granted in full as to all counter-claims in December 2023. 7-ER-1469. Though the deadlines for discovery and pretrial motions had expired, the court granted Ap-pellees leave to file their Third Amended Counterclaim ("TACC"), including "a new claim for defamation based on the same allegations supporting their trade libel claim." 7-ER-1499.

20

Appellees filed their TACC earlier this year, 6-ER-1250, which again asserted trade libel, UCL, and declaratory relief. For the first time, however, Appellees asserted a defamation claim and specified six discrete "statements disparaging Counterclaimants' products, services, and business practices" underlying all counterclaims. 6-ER-1262, ¶42; 6-ER-1266, ¶58; 1268-70, ¶¶73, 78-79. As alleged in TACC, these six statements included:

> **[1]** a false review stating that APM sold "burnt" pizza when the business does not even cook the pizza (since it is meant to take home and cook);

> **[2]** that APM "smelled like old fish inside"[;]

> **[3]** that a customer "got food poisoning" from APM;

> **[4]** that "[t]he owner laughed at me when I said my name for the order"[;]

> **[5]** a post with a picture of APM's store and a statement that it "[k]icks handicapped dogs"[;] and

> **[6]** a post stating "he" called Thakore a "sandn***er" as he walked by "Take N Bake."

6-ER-1262-63, ¶42; 6-ER-1266, ¶58. The TACC alleged all six statements were "made ... publicly ... on popular internet

21

platforms like Google and Yelp," 6-ER-1266, ¶60, and "widely disseminated … to the public." 6-ER-1263, ¶45. And unlike Appellees' prior pleadings, the TACC attached and incorporated more than 100 pages of expert reports purporting to quantify an alleged "loss of the market" caused by the operative statements. 6-ER-1263-65, ¶¶48-52 & n.1.

### C.  The District Court's Denial of Anti-SLAPP Protection

Faced with newly-pled counterclaims long after the deadlines for discovery and pretrial motions, Appellants moved to strike the TACC pursuant to California's anti-SLAPP statute. The district court denied Appellants' anti-SLAPP motion on April 17, 2024.[2] First, the district court found Appellants' anti-SLAPP motion "untimely" under Section 425.16(f) as to three of the four counterclaims (trade libel, UCL, and declaratory relief), but "timely" as to Appellees' defamation counterclaim and "reliance on defamation in the UCL and declaratory relief claims." 1-ER-31-33. Second, the district court held that none of the six statements underlying Appellees' defamation counterclaim concerned any

---

[2] Appellants simultaneously moved to dismiss the TACC pursuant to Rule 12(b)(6), which the district court denied in the same order.

"issue of public interest" within the meaning of Section 425.16(e)(3). 1-ER-33-35; 1-ER-38-39. The court thus declined to reach the merits of any of Appellees' counterclaims.

Within a week of the district court's ruling, Appellants timely filed a notice of appeal the anti-SLAPP ruling. 8-ER-1683. That same day, the district court set the case for trial less than three months later "as to [Appellants'] claims and those of [Appellees'] counterclaims not subject to [Appellants'] interlocutory appeal … due to the untimeliness of [Appellants'] anti-SLAPP motion." 2-ER-55. Briefing ensued both before the district court and this Court regarding whether the case below should be stayed pending appellate review of the anti-SLAPP ruling. After originally denying the stay, the district court later reversed course and granted the stay upon finding that "judicial efficiency is served by trying the claims together."[3]

---

[3] May 24, 2024, Hrg. Tr. at 14:8-9; *see* 2-ER-43 (stay order adopting "reasons" stated at hearing). The transcript is not currently available from the district court's record, 8-ER-1703 (Dkt. 130), but was submitted on this Court's docket as No. 16.1 at p. 22.

23

## SUMMARY OF THE ARGUMENT

The district court erred both in its analysis and ruling denying Appellants' anti-SLAPP motion. This Court should reverse that ruling or remand with instructions to decide the anti-SLAPP motion under the proper legal standards.

**I.** The scope of this anti-SLAPP appeal includes all Appellees' counterclaims. The district court erred in denying anti-SLAPP review for some counterclaims as "untimely" under a state-court deadline this Court has held "fundamentally collide[s]" with federal procedure and thus "cannot apply in federal court." Because the Federal Rules allowed Appellants to challenge all amended counterclaims notwithstanding the expiration of the state-court deadline, Appellants' anti-SLAPP challenge was timely as to all counterclaims. Even if the state-court deadline were generally applicable, it would not apply here because: (1) the counterclaims added new claims and allegations triggering anti-SLAPP review; and (2) the counterclaims all arise from the same operative statements and thus render partial review impractical.

**II.** All counterclaims arise from protected activity in the form of "written ... statement[s] ... made in a ... public forum in connection with an issue of public interest." No one disputes that they all

24

arise from pure speech in public forums—two Instagram posts and four Yelp restaurant reviews. Appellees' TACC concedes that all six statements concerned issues of widespread public interest and impact—namely: the character, quality, and value of their own products and services. The district court's denial of protection based on the statements' alleged improper motive and illegitimacy conflicts with controlling California law holding those considerations irrelevant. The Court can reverse for this reason alone.

**III.** All counterclaims fail merits review.

**III.A.** Appellees cannot meet their burden to show that the operative statements were sufficiently factual to remove their protection under the First Amendment. Because the district court failed to address this issue under the correct legal standard, the Court can reverse and remand with instructions to apply it. Should the Court proceed to apply the correct standard in the first instance here, it should hold that the general and specific contexts of the operative statements—including their setting within a heated controversy, medium of subjective Internet reviews and exaggerated social-media account, loose and informal tenor, and hyperbolic and figurative language—conclusively negated any

reasonable implication that they were conveying objective truth. The inherent subjectivity and indefiniteness of the statements also renders them incapable of meaningful objective verification. The statements are thus nonactionable and all counterclaims should be dismissed.

**III.B.** The undated Instagram post is nonactionable for another reason: there is no record evidence that it would have been understood to identify Appellees or their products.

**III.C.** The trade libel counterclaim independently fails because the TACC alleges no loss of specific sales necessary to establish the essential element of special damages. The district court's contrary conclusion departed from clearly established California law.

**III.D.** The UCL counterclaim independently fails because the TACC only seeks and thus admits the adequacy of a legal remedy, thereby foreclosing any basis for equitable jurisdiction or relief.

## STANDARD OF REVIEW

This Court "review[s] de novo the district court's determination of a motion to strike under California's anti-SLAPP statute." *Makaeff*, 715 F.3d at 261; *accord Gunn v. Drage*, 65 F.4th 1109, 1118 (9th Cir. 2023).

## ARGUMENT

Although "[s]peech is often provocative and challenging," California's "legal tradition recognizes the importance of speech and other expressive activity even when—perhaps especially when—it is uncomfortable and inconvenient." *Geiser v. Kuhns*, 515 P.3d 623, 635 (Cal. 2022). "[T]o safeguard that tradition against those who would use the judicial process to chill speech they oppose," the state enacted Section 425.16. *Id.* "Familiarly known as the anti-SLAPP statute," Section 425.16 "allows [movants] to seek early dismissal of unmeritorious claims arising from protected speech and petitioning activities." *Bonni v. St. Joseph Health Sys.*, 491 P.3d 1058, 1062 (Cal. 2021); *see also City of Montebello v. Vasquez*, 376 P.3d 624, 632 n.11 (Cal. 2016) ("the California liberty of speech clause is broader and more protective than the free speech clause of the First Amendment"). "To achieve this purpose, courts are directed to construe the anti-SLAPP statute broadly." *Herring Networks, Inc. v. Maddow*, 8 F.4th 1148, 1155 (9th Cir. 2021) (quoting §425.16(a)); *see also Greater L.A. Agency on Deafness, Inc. v. Cable News Network, Inc.*, 742 F.3d 414, 421-22 (9th Cir. 2014) ("a narrow construction [of §425.16] would serve Californians poorly").

27

California courts analyze anti-SLAPP motions in two steps. "Initially, the mov[ant] [] bears the burden of establishing that the challenged allegations or claims 'arise from' protected activity in which [it] has engaged." *Wilson v. Cable News Network, Inc.*, 444 P.3d 706, 713 (Cal. 2019). "If the [movant] satisfies this requirement, the burden then shifts to the [claimant] to establish a reasonable probability that it will prevail on its claim in order for that claim to survive dismissal." *Herring*, 8 F.4th at 1155.

The district court limited its anti-SLAPP review to the defamation claim and reached only the first step of the two-part analysis. As set forth below: (§I) the district court erred in declining to review all counterclaims under the anti-SLAPP statute; (§II) the counterclaims all arose from protected activity, notwithstanding the district court's erroneous reliance on alleged improper motive; and (§III) should this Court reach the merits in the first instance, it should hold all the operative statements nonactionable.

## I. All Counterclaims Are Subject To Anti-SLAPP Review.

As an initial matter, the district court was wrong to decline anti-SLAPP review for three of the four counterclaims (trade libel, UCL, and declaratory relief) as "untimely" under Section

28

425.16(f). 1-ER-31-33. Although that provision generally requires anti-SLAPP motions to be "filed within 60 days of the service of the complaint," this Court has specifically held that the "60-day time frame" of Section 425.16(f) "fundamentally collide[s] with federal courts' rules of procedure" and thus "'cannot apply in federal court.'" *Sarver v. Chartier*, 813 F.3d 891, 900 (9th Cir. 2016) (quoting *Metabolife Int'l, Inc. v. Wornick*, 264 F.3d 832, 845-46 (9th Cir. 2001)).

The district court nonetheless held this Court's precedent "inapplicable," and instead applied Section 425.16(f), as interpreted by the California Supreme Court in *Newport Harbor Ventures, LLC v. Morris Cerullo World Evangelism*, 413 P.3d 650, 654-55 (Cal. 2018), which held that an amended complaint restarts Section 425.16(f)'s 60-day time frame to file an anti-SLAPP motion challenging "only new causes of action," but not "causes of action in an amended complaint that were included in an earlier complaint." 1-ER-28-32. The district court concluded that under *Newport*, Appellants' anti-SLAPP motion was "timely" "only as to [the] defamation claim and [] UCL and declaratory relief claims concerning the defamation," but "untimely" as to the "the trade libel claim

and the UCL and declaratory relief claims concerning that underlying trade libel." 1-ER-31; 1-ER-33. The court reasoned that "where [an] anti-SLAPP motion is analogous to a motion to dismiss, the discovery rationale underpinning *Metabolife* and *Sarver* do not apply." 1-ER-31-32; *see also* 2-ER-50-51.

The district court's decision to apply Section 425.16(f) *at all* was reversible error. This Court has never conditioned Section 425.16(f)'s application in federal court on a "discovery rationale" or whether "[an] anti-SLAPP motion is analogous to a motion to dismiss." 1-ER-30-31. It has instead made clear that Section 425.16(f) "*fundamentally collide[s]*" with federal procedure and therefore "*cannot apply in federal court.*" *Sarver*, 813 F.3d at 900. Although the Court in *Metabolife* relied on a particular collision between "the discovery-limiting aspects of §425.16(f) and (g)" and "the discovery-allowing aspects of Rule 56," 264 F.3d at 846, the Court in *Sarver* relied on a distinct, additional collision between "the timing controls imposed by §425.16(f)" and "the more permissive timeline Rule 56 provides for the filing of a motion for summary judgment." 813 F.3d at 900. *Metabolife*'s "discovery rationale" was irrelevant in *Sarver* because the anti-

30

SLAPP motion was raised and resolved solely on legal sufficiency grounds. *Id.* at 906 n.12 (rejecting argument that "district court engaged in impermissible factfinding" in deciding motion because "it is a *question of law* for the court whether a challenged statement is reasonably susceptible to a defamatory interpretation"). *Sarver*'s rationale for "declin[ing] to apply the statute's 60-day time frame" was the mere fact that Section 425.16(f) would have "restrict[ed] a party's ability to [file an anti-SLAPP motion] in a way [the Federal Rules] would not." *Id.* at 900.

That rationale requires the same result here. As in *Sarver*, "the timing controls imposed by §425.16(f)"—as interpreted by *Newport*—"directly collide with the more permissive timeline" provided by the Federal Rules for challenging amended pleadings. 813 F.3d at 900. For example, Rule 15(a)(3) authorizes a "response to an amended pleading" at least "14 days after service of the amended pleading," and Rule 12(b)(6) authorizes challenges to the sufficiency of any cause of action whenever "responsive pleading is allowed." Critically, this renewed time frame is not restricted to "only new causes of action," but freely allows challenges to "causes of action in an amended complaint that were

included in an earlier complaint." *Newport*, 413 P.3d at 652, 654-55; *cf. Nelson v. Adams USA, Inc.*, 529 U.S. 460, 467 n.1 (2000) ("Even when an amendment relates back to the original date of pleading, … the relation back cannot, consistently with due process, deny a party all opportunity to be heard in response to the amendment."). Accordingly, because Section 425.16(f) would "restrict [Appellees'] ability to [file such an anti-SLAPP motion] in a way Rule [12(b)(6) and 15(a)(3)] would not," the district court should have followed this Court's precedent "declin[ing] to apply the statute's 60-day time frame in federal court, and [] refer instead to [its] own rules of procedure," under which the motion was timely as to all amended counterclaims. *Sarver*, 813 F.3d at 900.

That the collision between Section 425.16(f) and the federal regime is incurably "fundamental" is demonstrated by the district court's attempt to apply it *in this case*. As interpreted in *Newport* for California state courts, Section 425.16(f) is supposed to "make the process more efficient" by allowing immediately-appealable anti-SLAPP challenges on some but not all claims within an amended pleading, since "[c]laims unaffected by the anti-SLAPP motion might be able to go forward." 413 P.3d at 655. But

the district court's application of Section 425.16(f) here was anything but "more efficient." By limiting anti-SLAPP review to only a "new" cause of action—notwithstanding its substantial overlap with the "old"—the district court effectively severed the case into two separate litigations before two separate tribunals undertaking simultaneous review of overlapping claims. As the district court itself later recognized when it stayed the entire case pending this appeal, "judicial efficiency is served by trying the claims together." *Supra* n.3. Had the district court simply declined to apply Section 425.16(f) as this Court's precedent required, Appellees' counterclaims would remain consolidated, and this Court would have had the benefit of the district court's anti-SLAPP analysis as to them all.

The district court voiced concern for the "potential for abuse" of belated anti-SLAPP motions, and faulted Appellants for "cho[osing] not to file an anti-SLAPP motion concerning the SACC before the May 1, 2023 deadline for pretrial motions" and instead "fil[ing] motion for judgment on the pleadings." 1-ER- 30-32. But the district court *granted* that motion *in full*, dismissing *all* counterclaims. 7-ER-1500. It was certainly no "abuse" for

Appellants to choose a different but meritorious vehicle for chal-
lenging the counterclaims at an earlier stage of the case. Because
the district court allowed Appellees to replead *all* counterclaims
anew—for the fourth time and after the deadlines for discovery
and pretrial motions—Appellants were entitled to challenge *all*
counterclaims anew, including in an anti-SLAPP motion, notwith-
standing any state procedural rule stating otherwise.

In any case, even if Section 425.16(f)'s 60-day time frame
were applicable in federal court in particularized circumstances
this Court has never recognized, it would not prevent the Court
from reaching all counterclaims here—for at least two reasons.

First, Appellees' TACC "add[ed] new allegations that ma[d]e
previously pleaded causes of action subject to an anti-SLAPP mo-
tion," and thereby remained challengeable under *Newport*, 413
P.3d at 652. Unlike Appellees' prior counterclaims, the TACC at-
tached and incorporated more than 100 pages of expert reports de-
tailing a host of new allegations bearing directly on the "public
interest" in the alleged speech. *See infra* §II.B (collecting quotes).
For example, the TACC alleged for the first time that the alleged
speech generated enough public interest to "deprive[] [Appellees]

34

of a *market*." 6-ER-1264, ¶50. By expressly alleging a public interest in the operative speech, the TACC's "new allegations [] "ma[de] previously pleaded causes of action subject to an anti-SLAPP motion." *Newport*, 413 P.3d at 625. In addition, Appellees failed to *specify* any of the six operative statements as "asserted grounds for relief" for their counterclaims until they filed their TACC. 6-ER-1262, ¶42; 6-ER-1266, ¶58; *Baral v. Schnitt*, 376 P.3d 604, 616 (Cal. 2016) (claims are not subject to anti-SLAPP motion unless "allegations of protected activity [] are *asserted as grounds for relief*") (modified emphasis). Though the prior counterclaims identified the statements among a range of others asserted as "*General* Allegations," 7-ER-1505-11, ¶¶9-29, they asserted *other* statements as the "*specific*[]" grounds for trade libel. 7-ER-1513, ¶31. In sum, because the TACC alleged for the first time that Appellees' counterclaims arose from six particularized statements in connection with issues of widespread public interest, Appellants were entitled to seek anti-SLAPP protection against all counterclaims under *Newport*.

Second, regardless of *Newport*'s import, the district court abused its discretion in failing to find "good cause" for extending

anti-SLAPP review to all counterclaims. Good cause "focuses on the reasonable diligence of the moving party," *Noyes v. Kelly Servs.*, 488 F.3d 1163, 1174 n.6 (9th Cir. 2007), and a district court "abuses its discretion when it makes an error of law" or "rules in an irrational manner." *United States v. Sherburne*, 249 F.3d 1121, 1125-26 (9th Cir. 2001). By finding "good cause" to relax Section 425.16(f)'s deadline for some but not all amended counterclaims despite their substantial overlap, the district court overlooked the impractical impact of severing the case into two competing tracks. That this manner of ruling was "irrational" is confirmed by the district court's later recognition of the futility of trying a case involving the same issues on appeal. 2-ER-43. It is also confirmed by the rulling's effect of penalizing Appellants for successfully persuading the district court to dismiss the original counterclaims in their entirety on other grounds in December 2023—long after the deadline for filing pretrial motions had passed. 7-ER-1502; 1-ER-32 (asserting that Appellants "*waited* until [Appellees] filed the TACC and then brought their Anti-SLAPP Motion").

In sum, there was no persuasive reason for the district court to decline anti-SLAPP review for some but not all Appellees' counterclaims. Given their substantial and undisputed overlap, and the applicable de novo review standard, the Court should adjudicate the anti-SLAPP motion as to all counterclaims without limitation.

## II. All Counterclaims Arise From Protected Activity.

All counterclaims readily satisfy the first step of anti-SLAPP review because the TACC itself concedes they all "'arise from' protected activity." *Wilson*, 444 P.3d at 713. As relevant here, such "protected activity" includes "any written or oral statement or writing made in a place open to the public or a public forum in connection with an issue of public interest." §425.16(e)(3); 4-ER-738-39 (invoking §425.16(e)(3)); 1-ER-35 (same). Unlike statements made in a "private context" that "make[] heavier [the movant's] burden" at step one, *Wilson*, 444 P.3d at 726, statements made "in a place open to the public or a public forum"—especially on the Internet—are generally protected because Subsection (e)(3) "defines [protected activity] not only by its content, but also by its also by its location" and "audience." *FilmOn.com Inc. v. DoubleVerify Inc.*, 439 P.3d 1156, 1161 (Cal. 2019); *see also*

*Wilson*, 444 P.3d at 719 n.8 ("publication of Internet content" is "entitled to 1st Amend. protection").

As explained below, Appellees' counterclaims *expressly* arise from written statements (reviews and posts) in a public forum (the Internet) about issues of public interest (the character, quality, and value of Appellees' products and services). Because this qualifies the statements for anti-SLAPP protection under Section 425.16(e)(3), the district court's step-one ruling was incorrect. Further, the district court's reliance on the alleged improper motive of the statements was legal error. This Court should reverse.

### A.  All counterclaims rest on speech in a public forum.

Appellees expressly concede that all their counterclaims arise from "written … statement[s]." §425.16(e)(3). Their TACC alleges that every counterclaim rests on six "*statements in writing*"—four online "review[s]" and two Instagram "post[s]." 6-ER-1262-63, ¶42 (trade libel); 6-ER-1266, ¶58 (defamation); 6-ER-1268-69, ¶73 (UCL); 6-ER-1269-70, ¶¶78-79 (declaratory relief); *see also* 4-ER-674 (Appellees: "the allegations of statements … relied upon in the TACC to assert [Appellees'] defamation claim are *identical* to the allegations relied upon for

38

[Appellees] to assert their trade libel claim") (Appellees' emphasis); 1-ER-20 (district court: "Each of the statements [Appellees] assert are defamatory were contained in [their] original counter-claims" for trade libel, unfair competition, and declaratory relief).

Appellees further concede that none of these operative statements were made in *private*, but were all instead "made in a place open to the public or a public forum." §425.16(e)(3). In particular, the TACC alleges that all six statements were "made … publicly … on popular [I]nternet platforms like Google and Yelp," 6-ER-1266, ¶60, and "widely disseminated … to the public." 6-ER-1263, ¶45. It is well-established that "[w]eb sites accessible to the public … are 'public forums' for purposes of the anti-SLAPP statute." *Barrett v. Rosenthal*, 146 P.3d 510, 514 n.4 (Cal. 2006).

There is accordingly no dispute that public "speech … *itself* is the wrong complained of, and not just evidence of liability or a step leading to some different act for which liability is asserted." *Wilson*, 444 P.3d at 713 (original emphasis); *cf. Bonni*, 491 P.3d at 1070-71 & n.4 (finding alleged acts of "[e]ngaging in a campaign of character assassination" and "[m]aking defamatory statements" "describe[d] quintessential speech activities").

39

### B.  The operative speech concerns public issues.

The only dispute before the district court at step one was whether the operative public statements concerned "an issue of public interest." §425.16(e)(3). What constitutes an "issue of public interest" is "exceedingly expansive," *Summit Bank v. Rogers*, 142 Cal.Rptr.3d 40, 59 (Ct.App.2012), and encompasses "*any issue in which the public is interested*." *Doe v. Gangland Prods., Inc.*, 730 F.3d 946, 955 n.4 (9th Cir. 2013) (original emphasis). This Court has "construed 'public issue or public interest' broadly" to protect at least "three categories of public issues: (1) statements concerning a person or entity in the public eye; (2) conduct that could directly affect a large number of people beyond the direct participants; (3) or a topic of widespread, public interest." *Sarver*, 813 F.3d at 901.

As relevant here, California courts have repeatedly held that public statements about the character, quality, or value of a business's products and services concern an "issue of public interest." *Yang v. Tenet Healthcare Inc.*, 262 Cal.Rptr.3d 429, 434-35 (Ct.App.2020) (public statements about claimant's "qualifications, competence, and professional ethics" were "similar to a

statement made by a third party to aid and protect consumers, …
which has consistently been held to constitute protected activity"); *see also Abir Cohen Treyzon Salo, LLP v. Lahiji*, 254
Cal.Rptr.3d 1, 5 (Ct.App.2019) ("reviews posted to an Internet
website [Yelp] meet th[e] definition of protected activity"); *Demetriades v. Yelp, Inc.*, 175 Cal.Rptr.3d 131, 143 (Ct.App.2014)
("Yelp's Web site is a public forum and contains matters of public
concern in its reviews of restaurants and other businesses"—including "the content of the reviews themselves"); *Chaker v.
Mateo*, 147 Cal.Rptr.3d 496, 498, 502 (Ct.App.2012) ("a series
of derogatory statements about [claimant], and his [] business, appear[ing] on an Internet Web site where members of the public
may comment on the reliability and honesty of various providers
of goods and services" and "on another social networking Web
site which provided an open forum for members of the public to
comment on a variety of subjects" "plainly fall[s] within the rubric of consumer information" and "broad parameters of public interest"); *Summit Bank*, 142 Cal.Rptr.3d at 46-47, 58-59
("post[ing] 21 derogatory comments in a two-month period" on
"the 'Rants and Raves' section of Craigslist" about a "Bank's

financial stability and its management decisions" concerns public issue); *Wilbanks v. Wolk*, 17 Cal.Rptr.3d 497, 508 (Ct.App.2004) ("a warning not to use [the claimant's] services" posted online "[i]n the context of information ostensibly provided to aid consumers choosing among [service providers]" is "directly connected to an issue of public concern"); *Wong v. Jing*, 117 Cal.Rptr.3d 747, 753-54 (Ct.App.2010) ("allegedly false assertions contained in a review posted on Yelp that criticized the dental services [claimant] had provided to [movant]" implicated public issue); *accord Makaeff*, 715 F.3d at 262-63 (statements "post[ed] on anonymous third-party websites" as "a warning not to use [claimant's] services" constitute "a topic of widespread public interest"); *cf. Aristocrat Plastic Surgery P.C. v. Silva*, 206 A.D.3d 26, 30-31 (N.Y.App.Div.2022) ("[t]he review of [a] restaurant [is] of interest to the public who might patronize it" and "California courts applying the California anti-SLAPP statute … have found that client or patient reviews on public websites concern public interests"). Courts interpreting similar statutes specifically held that alleged "fake consumer reviews" constitute protected activity. *Morrison v. Profanchik*, 578 S.W.3d 676, 681-82

(Tex.App.2019) (interpreting the Texas Citizens Participation Act ("TCPA")); *see also Clifford v. Trump*, 818 F. App'x 746, 747 (9th Cir. 2020) ("[T]he TCPA is indistinguishable from California's [anti-SLAPP] law in all material respects[.]").

Every operative statement here concerns the character, quality, and value of a restaurant's products and services. The Court can "find the answer to this question in the [third] amended complaint." *DuPont Merck Pharm. Co. v. Superior Ct.*, 92 Cal.Rptr.2d 755, 759 (Ct.App.2000). For example, the TACC alleges that all six statements "disparage[ed] [Appellees'] ***products, services, and business practices,***" 6-ER-1262-63, ¶42, and "***explicitly and implicitly concerned the character of*** [***Appellees'***] ***business***, and ***implored customers not to support*** [] ***APM***." 6-ER-1263, ¶44; *see also, e.g.*, *id.*, ¶43 (alleging "statements were coextensive of both APM's and Melone's *products and services*" and "specifically disparag[ed] ***the quality of Melone's services***"); *id.*, ¶48 (alleging "impairment of ***the vendibility or value of*** [***Appellees'***] ***products and services*** caused by" the statements); 6-ER-1266, ¶58 ("statements in writing *about* [*Appellees'*] *character*"). The TACC further alleges that the statements were made "publicly to individuals other

43

than [Appellees], including on popular internet platforms like Google and Yelp, … all of whom would reasonably understand that the statements … were *about* [*Appellees*]." *Id.*, ¶60; *see also* 6-ER-1263, ¶¶45, 47 (alleging statements were "widely disseminated … to the public" such that "someone else might act in reliance on the statements"). According to the TACC, these statements generated enough public interest to "***deprive*** [***Appellees***] ***of a market***" and "***dissuade***[]" "***customers*** … from purchasing goods and services from APM." 6-ER-1264, ¶50. Appellees sought to defend the legal sufficiency of their counterclaims by relying on the district court's findings that the operative "'statements ***concern***[] ***the quality of their goods***'" and "'explicitly and implicitly *implore customers* not to support Defendant APM, at least in part, because the business engages in animal abuse and racism.'" 2-ER-228 (quoting 7-ER-1480-81).

Accordingly, any contention that these operative statements concerned only a "private dispute" between the parties is "belied by [Appellees'] own filings," *Bonni*, 491 P.3d at 1071, which expressly concede that the statements all "implored" and "dissuaded" third-party "customers" about the "character,"

"quality," and "value" of Appellees' "products and services." At step one, these allegations are dispositive, as the Court must "assume [Appellees'] complaint means what it says." *Id.*; *accord Gunn*, 65 F.4th at 1122 (claimants are "limited by [their] complaint" because California "[c]ourts have rejected attempts by [claimants] opposing anti-SLAPP motions to disavow their own allegations"). On their face, Appellees' allegations conclusively establish that all operative statements "directly affect[ed] a large number of people beyond the direct participants" and concerned "a topic of widespread, public interest." *Sarver*, 813 F.3d at 901.

In fact, had the operative statements *not* affected anyone beyond the parties or generated widespread interest, Appellees' counterclaims would be implausible. In order for Appellees to plead trade libel, for example, they had to allege operative statements that "must specifically refer to [Appellees'] product or business, and (2) must clearly derogate that product or business." *Hartford Cas. Ins. Co. v. Swift Distrib., Inc.*, 326 P.3d 253, 260-61 (Cal. 2014). Appellees were also required to plead "special damages" flowing from those statements, which they alleged in the form of "***loss of the market***." 6-ER-1264, ¶50 & n.1. But the

operative statements could not possibly affect "the market" without "affect[ing] a large number of people beyond the direct participants." *Sarver*, 813 F.3d at 901. Indeed, Appellees attached an expert report to their TACC purporting to quantify their "reputational harm due to the alleged disparaging statements." 7-ER-1366. Like the TACC itself, Appellees' expert report repeatedly concedes that the operative statements both "directly affect[ed] a large number of people beyond the direct participants" and generated "widespread, public interest"—

- "[T]he information was primarily spread in an uncontrolled manner" because "[t]he press releases led to mainstream media stories," "[p]eople picked up on the story and spread it through social media," and "[p]eople throughout the community formed an opinion about [Appellees]." 7-ER-1389.

- "[O]nline reviews can shape consumer behavior." 7-ER-1408.

- "Restaurant reviews, which consumers rely heavily upon making dining decisions, can be found on countless portals," including "classic review portals like Yelp" and "social media platforms[.]" *Id.*

- "[M]ost diners consider online reviews before choosing a restaurant." *Id.*

- "[T]he restaurant business is the most affected by negative reviews." *Id.*

46

- "With 94% of diners claiming online restaurant reviews influence them, reviews carry a great deal of weight when consumers decide where to patronize." *Id.*

- "91% of millennials rely on reviews as much as recommendations from people they know." *Id.*

- "One study showed that 90% of consumers consider reviews before visiting an establishment." 7-ER-1409.

- "[F]our or more bad comments can take up to 70 percent of a business's potential customers away." *Id.*

- "Academic evidence suggests that product information is more valuable for services than goods as they appear riskier. Therefore, restaurant customers are more likely to seek external information sources when they have not experienced it themselves." *Id.*

- "[M]ore than 145 million people visit Yelp each month, … and 92% of the users make a purchase after seeing the platform." 7-ER-1410.

The foregoing allegations by Appellees and their expert preclude any reasonable basis for contesting public-issue status. The "number of persons allegedly affected" by the operative statements is itself sufficient to "establish the issue as one of public interest." *DuPont*, 92 Cal.Rptr.2d at 759. That the issue was undisputedly "the subject of extensive media coverage" is also an "attribute[] … [that] make[s] it one of public, rather than merely

47

private, interest." *Geiser*, 515 P.3d at 630; *see also id.* at 635 (finding public-issue status "bolstered by the media coverage arising from the controversy and by the press release [nonmovants] issued in response to it"); 7-ER-1383 (Appellees' expert: "Mr. Melone … decided to provide comments for [a La Jolly Light article] so that more people knew about what was going on"); 7-ER-1390-95 (listing "[s]ampling" of media coverage).

On this record, Appellees' allegations readily confirm that the operative statements "directly affect[ed] a large number of people beyond the direct participants" and generated "widespread, public interest," and are thus protected under Section 425.16(e)(3).

## C. The district court's reliance on motive was legal error.

Despite alleging in their TACC a direct public interest in every operative statement underlying their counterclaims, Appellees argued that the statements are nonetheless unprotected solely on the basis of their alleged *improper motive*. Specifically, Appellees argued that anti-SLAPP protection did not turn on whether the statements implicated public issues, but rather whether they were "retaliatory," "false," or written for "nefarious purposes" with an "intention of harming [Appellees]." 2-ER-226-27; 4-ER-665-66.

The district court agreed. 1-ER-35-39. Relying on Appellees' "*allegations* of an *orchestrated* campaign to post *fake* reviews," 1-ER-38, the court concluded that the operative statements were unprotected solely because they were allegedly motivated by "an attempt to exact a personal revenge," "aimed to whip up a crowd for vengeful retribution," and reflected an "effort to gather ammunition in [Appellants'] spat with [Appellees]." 1-ER-38-39.

The district court's examination of and reliance on the alleged improper motive for otherwise-protected activity "cannot be squared with either the statutory text or [California] precedent interpreting it." *Wilson*, 444 P.3d at 714. At step one, "the question is only whether a [movant] has made out a prima facie case that *activity* underlying [the] claims is statutorily protected, not whether [the movant] has shown its acts are ultimately lawful." *Id.* at 715. The California Supreme Court has thus held that regardless of a movant's "purported wrongful motives," their "outward manifestations" are "the end of the story" at step one because "it is the [movant's] *acts* that matter." *Id.* at 714-15. "Notwithstanding assertions of an illicit motive, 'if the acts alleged are of the sort protected by the anti-SLAPP statute, then anti-SLAPP protections

apply.'" *Bonni*, 491 P.3d at 1065. "[A]ny claimed illegitimacy of [those] acts is an issue which the [nonmovant] must raise *and* support in the second step of the analysis[.]" *Gangland*, 730 F.3d at 954 (original emphasis). Were it otherwise, any "allegation of illicit motive w[ould] defeat any argument for anti-SLAPP protection." *Wilson*, 444 P.3d at 714. Accordingly, "[t]hat the claim arose from ... protected First Amendment activity[] [is] alone dispositive; allegations that [such activity] was ... based on a malicious motive[ are] ***irrelevant*** at the first step[.]" *Id.* at 716; *see also, e.g.*, *Bonni*, 491 P.3d at 1065 ("disapprov[ing]" of reliance on "alleged retaliatory motive"); *accord Gangland*, 730 F.3d at 954 (allegations that operative acts were "abusive" and "fraudulent[]" "ha[ve] no bearing on whether [movant] engaged in protected activity"); *DuPont*, 92 Cal.Rptr.2d at 758-59 (arguing that "false, deceptive, and misleading statements are not protected by the right of free speech" "plac[es] the cart before the horse").[4]

---

[4] A narrow exception makes the movant's motive relevant when their alleged operative act is not a "statement" under Section 425.16(e)(3) but rather "*other conduct* in furtherance of the exercise of the constitutional right of ... free speech" under Section 425.16(e)(4), making it necessary to determine "whether the [movant] took the action for speech-related reasons." *Wilson*, 444

Whether or not Appellees could support their allegations of improper motive or falsity with *evidence* makes no difference. *See, e.g.*, *Haight Ashbury Free Clinics, Inc. v. Happening House Ventures*, 110 Cal.Rptr.3d 129, 138 (Ct.App.2010) (argument that movant "admitted his letter contained statements that were false" did not render statements unprotected because "whether or not his statements were false does not determine whether they constitute protected activity"; §425.16 "pertains to '*any* written or oral statement or writing' … not merely to statements that everyone agrees were true"). "Nor does the anti-SLAPP statute require [Appellants] to *disprove* [Appellees'] allegations of illicit motive." *Wilson*, 444 P.3d at 715; *accord RGC Gaslamp, LLC v. Ehmcke Sheet Metal Co.*, 270 Cal.Rptr.3d 425, 440 (Ct.App.2020) (declining to "requir[e] a mov[ant] [] to affirmatively show that its statements were made in good faith").

The district court thus erred as a matter of law in conditioning anti-SLAPP protection on whether Appellants' public statements were "an orchestrated campaign to post fake reviews" motivated

---

P.3d at 716-17. This exception is plainly inapplicable here, however, because the alleged operative act is itself *speech. Supra* §II.A.

by "revenge," "vengeful retribution," or "personal animosity." 1-ER-38-39. Such questions about the legitimacy, truthfulness, and motivation of the alleged written statements are "irrelevant" to their protection under the anti-SLAPP statute. *Wilson*, 444 P.3d at 716. To qualify for statutory protection, Appellants were not required to demonstrate anything about their alleged public statements other than that they concerned "an issue of public interest." §425.16(e)(3). Any alleged illegitimacy, falsity, or illicit motive of such statements are "issue[s] which [Appellees] must raise *and* support in the second step of the analysis," *Gangland*, 730 F.3d at 954. By focusing on those issues at the first step of the anti-SLAPP inquiry, the district court committed reversible error.

That the alleged statements may have been motivated in part by a "private" dispute, moreover, is not a reason for excluding them from anti-SLAPP protection. The California Supreme Court has expressly rejected any "mode of analysis" that "focuse[s] on discerning a single topic of speech," because "speech is rarely 'about' any single issue" and "those who speak on public issues are often driven to do so by circumstances that affect them personally." *Geiser*, 515 P.3d at 630-31, 633-34. So long as the operative

statements "may reasonably be understood to implicate a public issue," they are protected—"even if [they] also implicate[] a private dispute." *Id.* at 633-34. As explained above, *supra* §II.B., Appellees have repeatedly conceded that the operative statements all implicate at least some public issues.

Neither of the intermediate appellate court decisions the district court principally relied upon change the result. 1-ER-35-36, 38 (citing *Woodhill Ventures, LLC v. Yang*, 283 Cal.Rptr.3d 507 (Ct.App.2021), and *Jeppson v. Ley*, 257 Cal.Rptr.3d 921 (Ct.App.2020)). Both decisions found operative statements to *only* concern "private" matters—a finding belied by Appellees' own allegations here. *Compare Woodhill*, 283 Cal.Rptr.3d at 512 ("the statements related *only* to a private dispute"), *Jeppson*, 257 Cal.Rptr.3d at 929 ("This tiff, though bitter, remained strictly local: a private affair"); *with* 6-ER-1263-64, ¶¶44, 50 (operative statements "explicitly and implicitly concerned the character of [Appellees'] business," "implored *customers* not to support [Appellee] APM," and "deprived [Appellees] of *a market*"). In any case, both decisions appear to conflict with pertinent rulings of the California Supreme Court, and should therefore not be followed.

*See, e.g., Gangland*, 730 F.3d at 956 n.5 (this Court only "fol-
low[s] the decisions of the state's intermediate appellate courts
where there is no convincing evidence that the state supreme court
would decide differently"). For example, the decisions' apparent
reliance on an absolute "public/private distinction," *Woodhill*,
283 Cal.Rptr.3d at 512; *Jeppson*, 257 Cal.Rptr.3d at 924 (same),
directly conflicts with *Geiser*'s later pronouncement that state-
ments may implicate public issues "even if [they] *also* implicate[]
a private dispute." 515 P.3d at 633-34. In addition, the premise of
both decisions that "[c]ourts must scrutinize the purpose of the
statements" at step one and determine whether they were moti-
vated by "personal revenge"[5] cannot be reconciled with *Wilson*'s
holding that the "motive" for otherwise-protected acts—includ-
ing whether they were done for "retaliatory reasons"—is "irrele-
vant" at step one. 444 P.3d at 711, 714-16, 718.

---

[5] *Woodhill*, 283 Cal.Rptr.3d at 515-16; *Jeppson*, 257 Cal.Rptr.3d
at 928 (conditioning protection on whether statements were
"merely an effort to gather ammunition for another round the
speaker's neighborhood wrangle").

* * *

In sum, Appellees' own pleadings clearly and unequivocally establish that all counterclaims arise from pure public speech about issues of public interest. That makes them subject to anti-SLAPP screening, regardless of whether the operative speech was made for good, bad, or terrible reasons. The district court erred in both its analysis and result at step one; the judgment should be reversed on that basis alone.

## III. All Counterclaims Fail On The Merits.

### A. The operative speech is protected opinion.

Appellees cannot show they can prevail on their counterclaims because the operative speech is all nonactionable under California law and the First Amendment.[6] Although the district court did not assess the merits of Appellees' counterclaims under the anti-SLAPP framework, it did address their legal sufficiency for purposes of Appellants' Rule 12 motions. 1-ER-11; 1-ER-15-18; 1-ER-

---

[6] The allegations of the TACC are assumed true for purposes of this legal issue, including allegations that Appellants made all six of the alleged statements. *Gardner v. Martino*, 563 F.3d 981, 986 (9th Cir. 2009) ("Whether an allegedly defamatory statement is one of opinion or fact is a question of law.").

20-21; 1-ER-25-27; 7-ER-1479-82. In so doing, as explained below, the district court applied the wrong legal standard to determine whether the operative speech is actionable. For that reason alone, this Court can remand with instructions for application of the correct law. Should the Court proceed to the merits under the correct legal standard, it should hold that Appellees have not met their burden and dismiss the counterclaims in their entirety.

### 1. The district court applied the wrong standard.

To prevail under California law and the First Amendment, Appellees were required to demonstrate that Mr. Thakore and DMM made a "statement of *fact* which is false" that defamed Appellees and harmed their reputation. *Herring*, 8 F.4th at 1157; *accord J-M Mfg. Co. v. Phillips & Cohen LLP*, 201 Cal.Rptr.3d 782, 790 (Ct.App.2016) (trade libel "like defamation, … requires a false statement of *fact*, not an expression of an opinion"). "[T]he threshold question," then, "is whether a reasonable factfinder could conclude that the [contested] statement *implies an assertion of objective fact.*" *Herring*, 8 F.4th at 1157 (original alteration); *see also ZL Techs., Inc. v. Gartner Grp., Inc.*, 433 F. App'x 547, 548 (9th Cir. 2011) (same "threshold question" for both defamation and trade

libel). This question is dispositive, because "[i]f the answer is no, the claim is foreclosed by the First Amendment." *Gardner*, 563 F.3d at 987.

To resolve this question, the Court applies a three-factor "totality of the circumstances" test:

> (1) whether the general tenor of the entire [speech] negates the impression that the [speaker] was asserting an objective fact,
>
> (2) whether the [speaker] used figurative or hyperbolic language that negates that impression, and
>
> (3) whether the statement in question is susceptible of being proved true or false.

*Herring*, 8 F.4th at 1157.

Critically, even when a statement "taken in isolation" is "susceptible of being proved true or false" or "capable of verification," the "general context and the specific context of the contested statement [may] negate the impression that [it] is an assertion of objective fact." *Id.* at 1160 (finding statement inactionable "rhetorical hyperbole" even though "the third factor tilts in the other direction"); *Knievel v. ESPN*, 393 F.3d 1068, 1078 (9th Cir. 2005) ("Because the [statement] cannot reasonably be interpreted

literally in this context, the fact that its literal interpretation could be proven true or false is immaterial."). Under this test, an "obvious exaggeration … could not reasonably be understood to imply an assertion of objective fact, and therefore, does not amount to defamation." *Herring*, 8 F.4th at 1151; *see also Baker v. Los Angeles Herald Exam'r*, 721 P.2d 87, 95 (Cal. 1986) (finding statements "used in a metaphorical, exaggerated or even fantastic sense … did not imply the existence of any undisclosed facts").

The district court has never answered this threshold question. While the court held all six operative statements actionable in separate orders adjudicating Appellants' Rule 12 motions, it never applied the three-factor "totality of the circumstances" test to determine, for example, whether the general and specific contexts of the operative statements rendered them insufficiently factual and thus nonactionable. The court instead held all operative statements actionable based solely on whether they "raise[d] a reasonable inference of an intent to harm [Appellee] APM's business" or "arguably concern[ed] the character of [Appellee] APM's business." 7-ER-1480; 1-ER-16 (reaffirming prior ruling). That is not the proper inquiry under California law and the First Amendment.

Indeed, "[e]ven if [the statements were] objectively unjustified or made in bad faith, publications which are statements of opinion rather than fact cannot form the basis for a libel action." *Campanelli v. Regents of Univ. of Cal.*, 51 Cal.Rptr.2d 891, 894 (Ct.App.1996). At a minimum, the district court's application of the wrong standard on a dispositive question requires remand with a corrective instruction.

Under the correct legal standard—to the extent this Court proceeds to apply it in the first instance here—the contexts surrounding each operative statement demonstrate that none would be perceived as assertions of objective fact.

### 2. The broad context negates factual implications.

"The context in which the statement appears"—context the district court never addressed—"is paramount in [the] analysis, and in some cases it can be *dispositive*." *Knievel*, 393 F.3d at 1075; *see also, e.g.*, *Koch v. Goldway*, 817 F.2d 507, 509 (9th Cir. 1987) (Kennedy, J.) (concluding that "[c]ontext [] resolve[s] the matter" because "[c]ontext can be determinative that a statement is opinion and not fact, for the context of a statement may control whether words were understood in a defamatory sense"); *accord*

*Phoenix Trading, Inc. v. Loops LLC*, 732 F.3d 936, 945 (9th Cir. 2013) (finding "context and audience [] sufficient to preclude [nonmovant] from meeting its burden" because "context and audience often ensure that any implicit facts will be perceived as merely a characterization of those facts").

The first factor is the "broad context," which "includes the general tenor of the entire work, the subject of the statements, the setting, and the format of the work." *Herring*, 8 F.4th at 1157. In the context of an ongoing "heated [] debate," for example, "certain remarks are necessarily understood as ridicule or vituperation, ... [and] the statement cannot reasonably be taken as anything but opinion." *Id.* "[E]lements that would reduce the audience's expectation of learning an objective fact" include "drama, hyperbolic language, an opinionated and arrogant host, and heated controversy." *Gardner*, 563 F.3d at 988.

Every one of those elements were undeniably present in the broad context here. As discussed above, *supra* §II.B., the TACC concedes that all operative statements were made in the context of a larger, "heated controversy" over the character and quality of Appellees' business. *See, e.g.*, 6-ER-1253-54; 6-ER-1256-58; 6-

ER-1260; 6-ER-1262-63, ¶¶9-11, 17-23, 32, 42-43. That controversy featured, on one side, a flamboyant social-media personality who was nothing if not "opinionated," *Gardner*, 563 F.3d at 988, and on the other, a restaurant and its owner seeking to increase "community pressure" and "sway public opinion in [its] favor." 6-ER-1098. Against the backdrop of that broad context, any alleged "loose, hyperbolic statements," including those at issue here, would be readily understood as "ridicule or vituperation" and "obvious exaggeration[s]"—"not false factual assertions" supporting an action for defamation or libel. *Herring*, 8 F.4th at 1151, 1157; *Gardner*, 563 F.3d at 989. The lack of reasonable factual implication is further sealed by the statements' informal and sardonic tone. *See, e.g.*, *Chaker*, 147 Cal.Rptr.3d at 503 (statements "posted on the Internet" that "***lacked the formality and polish*** typically found in documents in which a reader would expect to find facts" were "nonactionable opinions"); *ComputerXpress, Inc. v. Jackson*, 113 Cal.Rptr.2d 625, 642 (Ct.App.2001) (Internet "postings were ***part of an on-going, free-wheeling and highly animated exchange about the company*** and were full of hyperbole, invective, short-hand phrases and language not generally found in

61

fact-based documents, … [thus] lack[ing] the formality and polish typically found in documents in which a reader would expect to find facts").

The broad context also includes "the medium through which the contested statement was made," which may itself "support[] [the] argument that a reasonable viewer would not conclude the statement implies an assertion of fact." *Herring*, 8 F.4th at 1157. The mediums through which the operative statements were made here—Internet review forums and social media—are not generally recognized as sources of objective truth:

> [A] reader should be predisposed to view the[] [speech] with a certain amount of skepticism, and with an understanding that [it] will likely present one-sided viewpoints rather than assertions of provable facts. [A]ny reader familiar with the culture of … most electronic bulletin boards … would know that board culture encourages discussion participants to play fast and loose with facts…. Indeed, the very fact that most of the posters remain anonymous, or pseudonymous, is a cue to discount their statements accordingly.

*Chaker*, 147 Cal.Rptr.3d at 503 (last alteration in original); *see also Baker*, 721 P.2d at 95 ("A reader of a [critical] review … does not reasonably expect every word of the review to be based on facts

…. Instead, one expects a reviewer's opinions to be based on aesthetic sense and discriminating taste."); *accord Law Offices of David Freydin, P.C. v. Chamara*, 24 F.4th 1122, 1130 (7th Cir. 2022) ("The defendants posted their reviews on … Facebook, Yelp, and Google pages, which invite unfiltered comments. We trust that ***readers of online reviews are skeptical about what they read, both positive and negative***."). Such online mediums presuppose heated discussion with fiery rhetoric and caustic remarks that cannot be reasonably taken as objective fact. *See Summit Bank*, 142 Cal.Rptr.3d at 60 ("[O]nline blogs and message boards are places where readers expect to see strongly worded opinions rather than objective facts"); *see also Reed v. Gallagher*, 204 Cal.Rptr.3d 178 (Ct.App.2016) ("[In the] setting in which the audience may anticipate efforts by the parties to persuade others to their positions by ***use of epithets, fiery rhetoric or hyperbole***, language which generally might be considered as statements of fact may well assume the character of statements of opinion."); *Penrose Hill, Ltd. v. Mabray*, 479 F.Supp.3d 840, 857-58 (N.D. Cal. 2020) (holding that Twitter qualifies as such a setting).

Where, as here, "the allegedly defamatory statement is first

63

and foremost a restaurant review, and, second, the statement is a Yelp review," the "context strongly signals to readers that the review merely reflects the writer's opinion.'" *Sciore v. Phung*, 2022 WL 950261, at \*6-8 (D.N.J. Mar. 30, 2022) (quoting *Mirza v. Amar*, 513 F.Supp.3d 292, 297-98 (E.D.N.Y. 2021)).[7] That is because "[*r*]*estaurant reviews are* [] *the well recognized home of opinion and comment*," as "[t]he natural function of the review is to convey the critic's opinion of the restaurant reviewed," which is "to a large extent controlled by personal tastes." *Mr. Chow*, 759 F.2d at 227-28. As a result, "[t]he average reader approaches a review with the knowledge that it contains only one person's views of the establishment." *Id.*; *accord Polygram Records, Inc. v. Superior Court*, 216 Cal.Rptr. 252, 261, n.20 (Ct.App.1985) (citing *Mr.*

---

[7] "New York courts" are "particularly well-versed in actions for defamation based on negative restaurant reviews." *Sciore*, 2022 WL 950261, at \*7-8 (collecting "a significant weight of authorities holding restaurant reviews as nondefamatory opinion," including, *inter alia*, the "seminal" authority on restaurant reviews, *Mr. Chow of N.Y. v. Ste. Jour Azur S.A.*, 759 F.2d 219, 227-28 (2d Cir. 1985), and *Themed Restaurants, Inc. v. Zagat Surv., LLC*, 21 A.D.3d 826, 827 (N.Y.App.Div.2005) ("restaurant ratings and reviews almost invariably constitute expressions of opinion")); *cf. Aristocrat*, 206 A.D.3d at 31 (observing anti-SLAPP statutes of New York and California are "similar").

*Chow* and confirming that "caustic criticism of food has been deemed an expression of opinion protected under the First Amendment"); *cf. Baker*, 721 P.2d at 96 (reviews "cannot be reasonably viewed as statement of fact" because "[*t*]*he point of any review* … *is to convey the reviewer's opinion*").

Whether reviews are genuine or "fake," moreover, is irrelevant to whether they would have been *reasonably understood* to convey objective facts. *See, e.g.*, *Freydin*, 24 F.4th at 1130-31 (falsely implying reviewer's customer relationship did not negate impression of reasonable observer as opinion); *cf. Hustler Magazine, Inc. v. Falwell*, 485 U.S. 46, 53 (1988) ("things done with motives that are less than admirable are protected by the First Amendment[,] … even when a speaker or writer is motivated by hatred or illwill"). That they would not be so undertood is especially clear where, as here, the reviews were themselves expressly identified as "fake" to third-party observers. 6-ER-1253-54, ¶11; 6-ER-1291. *See Steam Press Holdings v. Hawaii Teamsters, Allied Workers Union, Local 996*, 302 F.3d 998, 1008 (9th Cir. 2002) ("A reasonable audience confronted with two competing stories, in the context of a heated … dispute, would be inclined to conclude that each story

represented the subjective view … of the particular speaker[, and] … would be reluctant to view either story as objective fact.").

The broad context of the two Instagram posts likewise counsels in favor of nonactionable expression. This is not only due to their medium of social media, as discussed above, but also the general tenor of the "acerogersceo" Instagram account as exaggerated, caricaturized, and overtly hyperbolic. 4-ER-605 at 316:5-10 ("Life of a pro gambler and CEO. At the Del Mar Race Track yesterday, private jet to Las Vegas today, gambling six to seven figures tonight. Back to the biggest and best CEO in Southern California tomorrow morning."); 4-ER-604 at 311:18-19 ("I am on my way to becoming a billionaire, I welcome all the haters and love"); *id.* at 312:6-9 ("Aspen and I are getting some work done on our yacht."). In this broad context, ***no reasonable reader would view this account as a source of any objective truth***. *See, e.g.*, *Knievel*, 393 F.3d at 1077-78 ("[r]ead in the context of the satirical, risque, and sophomoric slang found on the rest of the site," content "cannot be reasonably interpreted" as factual, since "the content of the … [web] page is lighthearted, jocular, and intended for a youthful audience" and employs "youthful, non-literal language"); *Leidholdt*

*v. L.F.P. Inc*, 860 F.2d 890, 894 (9th Cir. 1988) ("the fact[] that … the 'Asshole of the Month' column is an especially frequent vehicle for Hustler's lampooning of its critics, … will telegraph to a reader that the article presents opinions, not allegations of fact"); *Beilenson v. Superior Court*, 52 Cal.Rptr.2d 357, 362 (Ct.App.1996) ("rip-off" was a "colorful epithet, when taken in context with the other information contained in the mailer, was rhetorical hyperbole").

In sum, the broad context of all six operative statements heavily favors a finding of nonactionable expression.

### 3. The specific context negates factual implications.

The specific context of the operative statements even further negates any reasonable implication of objective fact. For this factor, the Court determines "whether the [speaker] used figurative or hyperbolic language that negates th[e] impression" that the statement "was asserting an objective fact." *Herring*, 8 F.4th at 1157. This requires "examin[ing] the specific context and content of the statements, analyzing the extent of figurative or hyperbolic language used and the reasonable expectations of the audience in that particular situation." *Id.* at 1159. It does *not* mean

67

"consider[ing] *only* the challenged [] phrase" or "read[ing] [it] in isolation," but instead "requires ... expanding [the] focus to the surrounding sentences." *Id.* Here again, "satirical, hyperbolic, imaginative, or figurative statements are protected because the context and tenor of the statements negate the impression that the author seriously is maintaining an assertion of actual fact." *Kieu Hoang v. Phong Minh Tran*, 274 Cal.Rptr.3d 567, 584 (Ct.App.2021) ("[r]hetorical hyperbole or loose, figurative, or hyperbolic language" negates factual implications); *see also Gilbert v. Sykes*, 53 Cal.Rptr.3d 752, 764 (Ct.App.2007) (same for "rhetorical hyperbole, vigorous epithet[s], lusty and imaginative expression[s] of ... contempt, and language used in a loose, figurative sense") (original alterations)); *accord Knievel*, 393 F.3d at 1075.

As an initial matter, Appellees cannot prove *any* specific context for at least one of the six operative statements—the "post stating that 'he' called Thakore a 'sandn***er' as he walked by 'Take N Bake'"—because Appellees have not alleged or shown *anything* about the context of this statement. *See Herring*, 8 F.4th at 1157 (finding claimant "could not meet its burden" to show statement would be understood as sufficiently factual under "totality

68

of the circumstances test"). The statement merely appears in the TACC as an ***undated*** screenshot of a temporary "story" from the Instagram handle "acerogersceo." 6-ER-1258, ¶23. Because there are no allegations or evidence of *when* this post appeared, or *who* it is referring to with the pronoun "he," it is impossible to discern the "reasonable expectations of the audience in that particular situation." *Herring*, 8 F.4th at 1159; *see, e.g.*, *Jones v. Thyssenkrupp Elevator Corp.*, 2006 WL 680553, at *6 (N.D. Cal. Mar. 14, 2006) (dismissing claim that lacked "any reference to the speakers of the defamatory communications, the recipients, the timing, or the context in which they were made").

In any case, Appellees purport to place the undated "sandn***er" post in the same context of the December 2021 post sharing an article about Appellants' lawsuit and employing additional loose, hyperbolic, and exaggerated opinions:

> Kicks handicapped dogs, uses frozen crust, hates anyone of color, despises the first amendment and gets sued for 10 million dollars. If you support Take n Bake pizza you support animal abuse, racism and frozen crust. It's not Take n Bake, its Digiorno #richdog #richdogonboard

69

4-ER-501. Taken together in this specific context,[8] the two operative Instagram statements are precisely the kind of rhetorical expressions that have always been held better suited for vindication on the Internet than in courtrooms. Their manifest use of "loose, figurative, [and] hyperbolic language … negates the impression that [they are] assertion[s] of fact." *Herring*, 8 F.4th at 1160. Any reasonable observer of the overtly over-the-top "acerogersceo" Instagram handle would understand its suggestion that a restaurant abuses disabled dogs and hurls around racial epithets to be the same kind of "obvious exaggeration[s]" as those with which they appeared—the restaurant "hat[ing] anyone of color," "support[ing] animal abuse, racism[,] and frozen crust," and selling "Digiorno." *See, e.g.*, *id.* at 1159-60 (finding assertion that news source was "really literally … paid Russian propaganda" was inactionable where "[a] reasonable person would understand [the] contested statement as an obvious exaggeration," notwithstanding its susceptibility of being proven true or false); *Knievel*, 393

---

[8] Even if the undated "sandn***er" post were alleged to occur in another context, it would still be inactionable for failing to sufficiently identify Appellees and their products. *See infra* §III.B.

F.3d at 1077 ("any reasonable viewer would have interpreted the word 'pimp' in the same loose, figurative sense" as the surrounding humorous context). That the specific context also expressly mentions an ongoing legal controversy further supports protection. *See Lieberman v. Fieger*, 338 F.3d 1076, 1082 (9th Cir. 2003) (statements that claimant was "mentally unbalanced," "nuts and "Looney Tunes" and was "laughed" out of court were nonactionable opinions because, *inter alia*, "[a] reasonable viewer would know that [claimant] and [the speaker] were locked in a legal dispute, that [claimant] had issued a press release about some aspect of it, and that [the speaker] was hotly disputing the claims"); *Ferlauto v. Hamsher*, 88 Cal.Rptr.2d 843, 850 (Ct.App.1999) (calling lawsuit "spurious" and "frivolous," and motion "stupid," "laughed at," and "a joke" were "common characterizations which are nothing more than the predictable opinion of one side to the lawsuit" and "cannot be the basis for a defamation claim").[9]

---

[9] Had the Instagram posts implied any facts in December 2021, they would have been absolutely privileged as comments concerning ongoing litigation. *See* CAL. CIV. CODE §§47(b), (d)(1)(A); *see also Engineer.AI Corp. v. Kaufman*, 2024 WL 242991, at *1 (9th Cir. 2024) (litigation privilege protects "communications with some relation to judicial proceedings" made to third parties with

The specific context of the four operative restaurant reviews likewise supports their protection. In fact, courts have held nearly identical statements nonactionable:

1. **Statements that food is over- or under-cooked**. 6-ER-1291; 6-ER-1262-63, ¶42 (TACC: "APM sold burnt pizza").[10] *See, e.g.*, *Mr. Chow*, 759 F.2d at 221-22, 229 (finding nonactionable reviews asserting, among others, "***badly cooked***" dough; "remained still ***frozen*** on the plate"; "rubbery … soaking … totally insipid"); *Clancy v. Vacationaire Ests., Inc.*, 2019 WL 955113, at *11 (D. Minn. Feb. 27, 2019) ("***cold*** fries"; "***undercooked*** hamburgers"). That Appellees' "business does not even cook the pizza (since it is meant to take home and cook)," 6-ER-1262-63, ¶42, conclusively

---

a "substantial interest" therein); *Blatt v. Pambakian*, 2021 WL 4352329, at *1 (9th Cir. 2021) ("The fair-and-true-report privilege protects fair and true reports of anything said in the course of a judicial proceeding, including pleadings."); *Abraham v. Lancaster Cmty. Hosp.*, 266 Cal.Rptr. 360, 377 (Ct.App.1990) ("It would be anomalous to hold that a litigant is privileged to make a publication necessary to bring an action but that he can be sued for defamation if he lets anyone know that he has brought it.").

[10] Appellees submitted no review describing their pizza as "burnt"; this allegation appears to reference a review describing their pizza is "over cooked" and "under cooked"—both of which are more subjective than "burnt."

negates any *reasonable* implication that a review concerning "burnt pizza" was conveying objective fact. *See Dworkin v. Hustler Mag. Inc.*, 867 F.2d 1188, 1194 (9th Cir. 1989) ("Ludicrous statements are much less insidious and debilitating than falsities that bear the ring of truth. We have little doubt that the outrageous and the outlandish will be recognized for what they are.").

2. **Statements complaining of foul odors**. 6-ER-1253-54, ¶11 (TACC: "APM 'smelled like old fish inside'"). *See*, *e.g.*, *Pasha v. Del Mar Coll. Dist.*, 2008 WL 11393146, at *2 (S.D. Tex. Sept. 11, 2008) ("The phrase ***'bad smell'*** is indefinite and ambiguous and does not convey a verifiable fact."); *Marom v. Pierot*, 2020 WL 6572509, at *5-6 (S.D.N.Y. Aug. 30, 2020), *report and recommendation adopted*, 2020 WL 6565199 (S.D.N.Y. Nov. 9, 2020) (assertion that "a ***smell that comes out of the house***" is nonactionable); *cf. Partington v. Bugliosi*, 56 F.3d 1147, 1153-54 (9th Cir. 1995) ("personal viewpoint" and "personal perspective" are "not assertions of an objective fact").

3. **Accusations of causing illness.** 6-ER-1253-54, ¶11 (TACC: "customer 'got food poisoning' from [] APM"). *See, e.g.*, *Campanelli*, 51 Cal.Rptr.2d at 895-97 (without "expertise in the subject

matter," parent's assertion that coach made her son "***physically ill***" was nonactionable because "the general public would not reasonably expect the parent to be making an observation which could be proven true or false in a medical sense"); *cf. Thimes Sols., Inc. v. TP Link USA Corp.*, 2024 WL 1328194, at *1 (9th Cir. Mar. 28, 2024) (professional observations by "laypersons" are necessarily "opinion statements").

4. **Sexually-suggestive jokes**. 6-ER-1253-54, ¶11 (TACC: "Mike Hawk" stating "[t]he owner laughed at me when I said my name for the order"). *See, e.g.*, *Gauna v. Frisella Nursery, Inc.*, 2023 WL 2645604, at *1 (E.D. Mo. Mar. 27, 2023) ("Mike Hawk" is "a sexually suggestive remark" because it "sound[s] like 'my cock'"). As Appellees admitted below, this statement is an obvious sexual innuendo and joke, which cannot be reasonably understood as factual. 3-ER-385-86 ("Mike Hawk: Historically used as a false name for the purpose of lude comedic effect.").

In sum, to the extent Appellees have alleged and can demonstrate any specific context for the six operative statements, that context includes rhetorical hyperbole and obvious exaggerations that no reasonable observer would trust to convey objective truth.

74

### 4.  Any factual implications are not provably false.

The last factor this Court considers is "whether the facts implied by [the operative statements] are susceptible of being proved true or false." *Herring*, 8 F.4th at 1160. The Court need not reach this factor to find all six operative statements nonactionable, however, because their "general context and the specific context … [can] negate the impression that [they are] assertion[s] of objective fact." *Id.* at 1160 (finding statement nonactionable despite finding its "audience could conclude that the statement implied an assertion of objective fact"); *Knievel*, 393 F.3d at 1078 ("[T]he fact that [statement's] literal interpretation could be proven true or false is immaterial.").

Even so, none of the statements here imply facts that are actually capable of being proven true or false. For one thing, they all imply nothing but "subjective judgments"—perceived intent to "kick" an animal, odor, jokes, self-diagnosis, and adequacy of cooking temperatures—all of which "are incapable of being proved true or false." *Reed*, 204 Cal.Rptr.3d at 189; *see also ZL Techs.*, 433 F. App'x at 548; *cf. Bose Corp. v. Consumers Union of U.S., Inc.*, 466 U.S. 485, 513 (1984) (explaining sensory

perceptions in particular as inherently subjective: "[W]e agree …
that the difference between hearing violin sounds move around the
room and hearing them wander back and forth fits easily within
the breathing space that gives life to the First Amendment.");
*Honolulu Data Entry Project, Ltd. v. D. Bello Assocs.*, 721 F. App'x
658, 661 (9th Cir. 2018) (perceiving conduct as "aggressive or
surprising depends upon an individual's subjective opinion").

To the extent these statements could be understood to imply
any facts at all, moreover, they would still be far too vague, cryp-
tic, and abstract to be meaningfully *proven*. Where is the line be-
tween "burnt" pizza and pizza cooked to perfection? When does
pushing back an approaching animal rise to the level of a "kick[]"?
What distinguishes the "smell[]" of "old" and unidentified
"fish"? How can the singular cause of self-diagnosed "food poi-
soning" be isolated from other possibilities? How can the mouth-
ing of a racial epithet at an unidentified time by an unidentified
"he" be objectively verified? There are no persuasive answers to
these questions. In the end, all operative statements "are simply
not susceptible of being proved true or false." *Steam Press*, 302
F.3d at 1008-09 ("abstract language" requiring further

clarification is not actionable); *see also Chaker*, 147 Cal.Rptr.3d at 504 (absence of specificity "as to the time or place of [plaintiff's] supposed behavior" is a "signal to the reader there is no factual basis for the accusations").

Even if "the question of truth or falsity [were] a close one, a court should err on the side of nonactionability." *Steam Press*, 302 F.3d at 1008; *see also Hosszu v. Barrett*, 716 F. App'x 622, 624 (9th Cir. 2017) (concluding that while statements "may imply" factual accusations, given their context, "they are nevertheless protected by the First Amendment and therefore not actionable").

\* \* \*

The First Amendment does not "penalize a rhetorical outburst in the midst of a heated campaign, which no reasonable person would take literally." *Rosenaur v. Scherer*, 105 Cal.Rptr.2d 674, 688 (Ct.App.2001). The expression need not be "high-minded discourse" to be protected, *Dworkin*, 867 F.2d at 1194, as even "crude" and "vulgar[]" speech receives "strong protection." *Mahanoy Area Sch. Dist. v. B.L. ex rel. Levy*, 594 U.S. 180, 190-91 (2021); *see also ComputerXpress,* 113 Cal.Rptr.2d at 643 (same for "disparaging" speech); *cf. Duran v. City of Douglas*, 904 F.2d

1372, 1378 (9th Cir. 1990) (same for "[i]narticulate and crude"). After all, "it is a prized American privilege to speak one's mind, although not always with perfect good taste[.]" *Rosenaur*, 105 Cal.Rptr.2d at 688 (citing *Bridges v. California* 314 U.S. 252, 270-271 (1941) (Black, J.)).

Appellees may show that the operative statements were offensive, unwise, and wanting for good taste. But Appellees cannot show any of them were actionable. Their general and specific contexts conclusively establishes that no reasonable reader would trust them as fact, and their objective verification is an exercise in futility. The Court should hold all six statements fully protected by the First Amendment and strike Appellees' counterclaims in their entirety.

## B. The undated speech fails to identify Appellees.

Alternatively, even if the undated "sandn***er" post were alleged to precede the specific context of the December 2021 post, it would still be inactionable because there is no evidence that it would have been understood to refer to *Appellees and their products*. Defamation "requires that the statement on which the claim is based must specifically refer to, or be 'of and concerning,' the

[claimant] in some way." *Blatty v. N.Y. Times Co.*, 728 P.2d 1177, 1182 (Cal. 1986). Trade libel requires the statement to "(1) specifically refer[] to the [claimant's] product or business and (2) clearly derogates that product or business." *Hartford Cas.*, 326 P.3d at 256.

The undated "sandn***er" post does not refer to any of these things. It does not mention APM, Melone, or any of their products. It attributes a racial epithet to an unidentified "he" located "by the Take N Bake." There is no record evidence of *when* this occurred or *who* "he" is. Had the post occurred before the December 2021 post identifying Appellees, for example, there is no foundation to suggest that the post would be understood to identify Mr. Melone or APM. Indeed, Mr. Melone concedes that "Take N Bake" is a generic term that does not identify APM. *See, e.g.*, 5-ER-1010-11, 1019 (Melone: "the term 'take-and-bake' is not in any part of the name of APM,'" is "too general of a term," and no marketing studies connect the term to APM); 6-ER-1178-93 (other businesses advertising products as "take & bake pizzas"). As "Take N Bake" could reference other restaurants and stores, Appellees cannot perform the "insurmountable task" of showing the term

79

referred to them. *Blatty*, 728 P.2d at 1185. There is simply no evidence that anyone would have understood this fleeting post (which could only last for 24 hours, 7-ER-1402) as referring to either Appellee or their products. *See SDV/ACCI, Inc. v. AT & T Corp.*, 522 F.3d 955, 961 (9th Cir. 2008). Accordingly, even if this post were not otherwise protected, it would still fail to support any of Appellees' counterclaims.

### C. There are no cognizable special damages for trade libel.

The trade libel claim fails for the additional, independent reason that Appellees cannot come close to establishing the element of special damages. Unlike defamation, "trade libel requires as an essential element that the [claimant] suffered direct financial harm because someone else acted in reliance on the [operative] statement." *Muddy Waters, LLC v. Superior Ct.*, 277 Cal.Rptr.3d 204, 221 (Ct.App.2021). Critically, "[t]o establish this element, **[*it*] *is not enough to show a general decline in* [*the claimant's*] *business resulting from the falsehood, even where no other cause for it is apparent*"; rather "it is only the *loss of specific sales* that can be recovered." *Id.*; *accord Thimes Sols., Inc. v. TP-Link USA Corp.*, 2022 WL 17818334, at *5 n.7 (C.D. Cal. Nov. 3, 2022), *aff'd*,

2024 WL 1328194 (9th Cir. Mar. 28, 2024) ("[T]he cases requiring this specific showing are legion."). To survive dismissal, then, Appellees "must identify the particular purchasers who have refrained from dealing with [them], and specify the transactions of which [they] claim[] to have been deprived." *Muddy Waters*, 277 Cal.Rptr.3d at 221; *accord* DAN B. DOBBS ET AL., THE LAW OF TORTS §659, p.627 (2d ed. 2011) ("[T]o allege and prove pecuniary loss, the injurious falsehood plaintiff must make specific allegations and adduce evidence of specific, named lost customers or other specific pecuniary harms such as the loss of credit with particular persons.").

Appellees have not even tried to make this showing. Their TACC fails to identify *any* specific customer or sale allegedly lost as a result of the operative statements. Appellees instead rely on— and the district court held sufficient—allegations of mere "general business loss and loss of market share." 4-ER-667-69, 1-ER-17-18. But the authorities cited by Appellees and the district court do not apply California law; they contradict it. *Compare Bilinski v. Keith Haring Found., Inc.*, 632 F. App'x 637, 643 (2d Cir. 2015) (suggesting legal sufficiency of "special damages based on *either*

81

lost sales *or loss of the market*" for purposes of "New York claim for product disparagement"), *with Thimes,* 2024 WL 1328194, at *2 (9th Cir.) ("establishing special damages" for California trade libel "requires a plaintiff to identify *specific transactions* of which it was deprived due to someone's reliance on the alleged libel") (citing *Muddy Waters*); *see also Daw Indus., Inc. v. Hanger Orthopedic Grp., Inc.*, 556 F. App'x 604, 605 (9th Cir. 2014) (trade libel "plaintiff '*may not rely on a general decline in business* arising from the [alleged] falsehood, and must instead identify particular customers and transactions of which it was deprived as a result of the libel'") (original alteration).[11]

Because Appellees have failed to plausibly plead any cognizable special damages, they cannot show any probability of success on their trade libel claim (or any derivative UCL or declaratory-

---

[11] Though inapplicable here, Appellees fail the requirements of their own "loss of market" theory by failing to plead any non-conclusory allegations tying that loss to the six operable statements. 6-ER-1263-65, ¶¶48, 51-53; 7-ER-1367, 1370-72, 1374, 1407 (Appellees' expert tying alleged loss instead to, *inter alia*, "negative impression" of APM vandalized; "physical media" of "vehicles and even aerial banners [that] attack APM," "more than a hundred fake negative reviews"; and "media coverage").

relief claim). Dismissal of those claims is thus required, whether or not the operative statements are actionable.

### D. There is no cognizable claim in equity under the UCL.

Even if an operative statement were otherwise actionable,[12] it would not be actionable under the UCL. "The UCL provides only for equitable remedies" awarded by courts with "equitable jurisdiction, which can only exist under federal common law if the [claimant] has *no adequate legal remedy*." *Guzman v. Polaris Indus. Inc.*, 49 F.4th 1308, 1313-14 (9th Cir. 2022). If the claimant has "an adequate remedy at law through [their] … claim for damages," there is no equitable jurisdiction, and "the district court was therefore required to dismiss [the] equitable UCL claim." *Id.* at 1312; *accord Sonner v. Premier Nutrition Corp.*, 971 F.3d 834, 844 (9th Cir. 2020). Appellees do not allege that they lack adequate legal remedies; nor do they allege any basis for

---

[12] If the operative statements are nonactionable, the UCL claim based on trade libel and defamation necessarily fails. *See Vargas v. JP Morgan Chase Bank, N.A.*, 30 F.Supp.3d 945, 952-53 (C.D. Cal. 2014) ("If unable to state a claim for the underlying offense, the plaintiff similarly cannot state a claim under UCL for unlawful practices.").

"restitution"—the only monetary remedy available under the UCL. *See Korea Supply Co. v. Lockheed Martin Corp.*, 63 P.3d 937, 944 (Cal. 2003) (noting "lost profits," "lost market share," or a "lost business opportunity" do not qualify as restitution under UCL). To the contrary, their counterclaims concede the existence of an adequate legal remedy by assigning value to "damages" arising from the same operative speech. 6-ER-1260, ¶30; 6-ER-1263-64, ¶48. The district court thus lacked equitable jurisdiction to entertain the UCL claims. And even if it did not, the UCL claims would fail for lack of remedy.[13]

---

[13] The Court can reach both UCL arguments even if they were not raised below. *See Greger v. Barnhart*, 464 F.3d 968, 973 (9th Cir. 2006) (review allowed if "the issue presented is purely one of law and either does not depend on the factual record developed below, or the pertinent record has been fully developed"); *see also Southern Pac. R. Co. v. U.S.*, 200 U.S. 341, 349 (1906) (objection to equitable jurisdiction "need not always be raised by some pleading, but may be presented on the hearing even in the appellate court").

## CONCLUSION AND STATEMENT OF RELIEF SOUGHT

The judgment denying the anti-SLAPP motion should be reversed, and this Court should hold that: (1) all counterclaims are subject to anti-SLAPP review; (2) all counterclaims arise from protected activity; and (3) all counterclaims fail on the merits. Alternatively, the Court should remand with instructions for the district court to decide the anti-SLAPP motion under the correct legal standards.

Respectfully submitted,

/s/ *Marina Bogorad*
　　　Marina Bogorad

**MUNCK WILSON MANDALA LLP**
ANTON "TONY" HANDAL (SBN 113812)
thandal@munckwilson.com
MARINA BOGORAD (SBN 217524)
mbogorad@munckwilson.com
1925 Century Park East, St. 2300
Los Angeles, California 90067
(310) 855-3311
(972) 628-3616 fax

**MUNCK WILSON MANDALA LLP**
CHASE A. COBERN (SBN 24101633)
ccobern@munckwilson.com
12770 Coit Road, St. 600
Dallas, Texas 75251
(972) 628-3600
(972) 628-3616 fax

*Counsel for Appellants*

July 1, 2024

## CERTIFICATE OF COMPLIANCE

1. This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 13,595 words, excluding the parts of the brief as exempted by Fed. R. App. P. 32(f).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6). This brief has been prepared in Microsoft word using 14-point Century Supra, a proportionally spaced typeface.

Dated: July 1, 2024

/s/ *Marina Bogorad*
Marina Bogorad

## CERTIFICATE OF SERVICE
### [Case No. 24-2626]

I certify that on July 1, 2024, I electronically filed the foregoing APPELLANTS' OPENING BRIEF with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the ACMS system.

I certify that each party in the case is represented by counsel who are registered ACMS users and will be served by the ACMS system.

Dated: July 1, 2024

/s/   *Marina Bogorad*
Marina Bogorad